```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF TENNESSEE
                   WESTERN DIVISION
```

———————————————————————————————————————————————————

NAJEEB IQBAL,

       Plaintiff,

vs.                              No. 09-2815-STA-dkv

PINNACLE AIRLINES, INC.,

       Defendant.

———————————————————————————————————————————————————

```
     ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
                    (DOCKET ENTRY 21)
                   ORDER OF DISMISSAL
          ORDER CERTIFYING APPEAL NOT TAKEN IN GOOD FAITH
                            AND
       ORDER DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL
```

———————————————————————————————————————————————————

On December 15, 2009, Plaintiff Najib Iqbal filed a pro se complaint alleging that Defendant Pinnacle Airlines, Inc. had discriminated against him under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-16, and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq. (Docket Entry (D.E.) 1.) The complaint alleged that Defendant discriminated against Plaintiff Iqbal on the basis of his age, national origin, accent, race, and religion and terminated him without cause. (Id. at 2-3.) Plaintiff also alleged that he was retaliated against for asserting his rights under the Collective Bargaining Agreement ("CBA") and his rights under Title VII. (Id. at 3.) On March 12, 2010, Defendant filed an answer to the complaint. (D.E. 6.)

On May 2, 2011, Defendant filed a motion for summary judgment, supported by a legal memorandum, a statement of undisputed facts, portions of Plaintiff's deposition testimony, the affidavit of Scott Foley, Defendant's Director of Flying, the affidavit of Fadi Hamza, Defendant's Assistant Flight Standards Manager,[1] and other exhibits. (D.E. 21.) On June 3, 2011, Plaintiff responded to the motion for summary judgment.[2] (D.E. 25.)

Under Federal Rule of Civil Procedure 56, on motion of a party, the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party moving for summary judgment "bears the burden of clearly and convincingly establishing the nonexistence of any genuine [dispute] of material fact, and the evidence as well as all inferences drawn therefrom must be read in a light most favorable to the party opposing the motion." Kochins v. Linden-Alimak, Inc.,

---

[1]     Hamza was Defendant's Assistant Flight Standards Manager at the time of Iqbal's training. He is currently Defendant's Line Standards Representative. (See D.E. 21-5 at 1.)

[2]     The majority of Plaintiff's response contends that Defendant's motion for summary judgment should be denied due to Defendant's failure to make disclosures and cooperate in discovery. Plaintiff has twice filed motions to compel which the Court referred to United States Magistrate Judge Diane Vescovo for determination. (D.E. 12, D.E. 15.) Plaintiff's first motion to compel was denied because Plaintiff failed to comply with the Federal Rules of Civil Procedure and the Local Rules of Court. (D.E. 14.) Plaintiff's second motion to compel was denied due to his violation of procedural rules and because the motion was filed after the expiration of the discovery deadline. (D.E. 18.) After the denial of the second motion to compel, Plaintiff filed a motion to extend the discovery deadline. (D.E. 19.) On May 11, 2011, Judge Vescovo denied the motion because Plaintiff "continually violated several procedural rules governing discovery motions" and failed to act in good faith. (D.E. 24 at 5.) Judge Vescovo's orders addressed Plaintiff's discovery disputes and Plaintiff did not file objections to those orders. Plaintiff may not now assign error to those orders. Fed. Rule Civ. P. 72(a). Plaintiff's discovery disputes were resolved by Judge Vescovo and will not be revisited here.

2

799 F.2d 1128, 1133 (6th Cir. 1986); see Fed. R. Civ. P. 56(a). The moving party can meet this burden by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his case. See Fed. R. Civ. P. 56(c)(2); Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

When confronted with a properly supported motion for summary judgment, the respondent must set forth specific facts showing that there is a genuine dispute for trial. See Fed. R. Civ. P. 56(c). A genuine dispute for trial exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). One may not oppose a properly supported summary judgment motion by mere reliance on the pleadings. See Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). Instead, the nonmovant must present "concrete evidence supporting [his] claims." Cloverdale Equip. Co. v. Simon Aerials, Inc., 869 F.2d 934, 937 (6th Cir. 1989) (citations omitted); see Fed. R. Civ. P. 56(c)(1). The district court does not have the duty to search the record for such evidence. See Fed. R. Civ. P. 56(c)(3); InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). The nonmovant has the duty to point out specific evidence in the record that would be sufficient to justify a jury decision in his favor. See Fed. R.

Civ. P. 56(c)(1); <u>InterRoyal Corp.</u>, 889 F.2d at 111. "Summary judgment is an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action[,] rather than a disfavored procedural shortcut." <u>FDIC v. Jeff Miller Stables</u>, 573 F.3d 289, 294 (6th Cir. 2009) (internal quotation marks and citations omitted).

Plaintiff did not respond to Defendant's statement of material facts. (D.E. 21-2.) Rather, Plaintiff responded to the facts contained in Defendant's memorandum in support. (D.E. 25-1.) Under Local Rule 56.1(b):

> Any party opposing the motion for summary judgment must respond to each fact set forth by the movant by either:
>
> (1)  agreeing that the fact is undisputed;
>
> (2)  agreeing that the fact is undisputed for the purpose of ruling on the motion for summary judgment only; or
>
> (3)  demonstrating that the fact is disputed.
>
> Each disputed fact must be supported by specific citation to the record. Such response shall be filed with any memorandum in response to the motion. The response must be made on the document provided by the movant or on another document in which the non-movant has reproduced the facts and citations verbatim as set forth by the movant. In either case, the non-movant must make a response to each fact set forth by the movant immediately below each fact set forth by the movant. In addition, the non-movant's response may contain a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried. Each such disputed fact shall be set forth in a separate, numbered paragraph with specific citations to the record supporting the contention that such fact is in dispute.

Plaintiff's response to the facts contained in Defendant's memorandum in support does not comply with Local Rule 56.1(b). (D.E. 25-1.) Under Local Rule 56.1(d), a "[f]ailure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these rules shall indicate that the essential facts are not disputed for purposes [of] summary judgment."[3]

Under Fed. R. Civ. P. 56(e):

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1)  give an opportunity to properly support or address the fact;
>
> (2)  consider the fact undisputed for purposes of the motion;
>
> (3)  grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; and
>
> (4)  issue any other appropriate order.

In evaluating a motion for summary judgment, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).[4]

---

[3]      The most recent version of the Court's Local Rules, which took effect March 1, 2011, are applicable to all actions pending on that date. Local Rule 1.1(b).

[4]      Even before the 2010 amendments to Rule 56, a court evaluating a summary judgment motion was not required to conduct an independent search of the record to determine whether there might be evidence to support a plaintiff's claims. Wimbush v. Wyeth, 619 F.3d 632, 638 n.4 (6th Cir. 2010) ("The most that Buchanan may point to as far as rebutting evidence is a large package of evidence attached to her response to Wyeth's partial summary judgment motion regarding punitive damages. This evidence was not attached to her brief responding to Wyeth's merits argument, nor was it cross-referenced in that brief. Instead,
(continued...)

The Court has, therefore, adopted Defendant's proposed factual findings to the extent they are properly supported by record evidence. Fed. R. Civ. P. 56(e)(3); see Carver v. Bunch, 946 F.2d 451, 454-55 (6th Cir. 1991). The Court cannot deny a motion for summary judgment on the expectation that the plaintiff will be able to produce evidence at trial to support his claims. Cox v. Kentucky Dep't of Transp., 53 F.3d 146, 149 (6th Cir. 1995) ("Essentially, a motion for summary judgment is a means by which to challenge the opposing party to 'put up or shut up' on a critical issue.").

The facts relevant to the pending motion are as follows:[5]

1. Defendant is a regional airline providing scheduled air transportation service throughout the United States, Canada, and Mexico for Delta Airlines. Pinnacle flies two kinds of aircraft manufactured by Bombardier: the Canadair Regional Jet ("CRJ") models CRJ-200 and CRJ-900. The CRJs are designed with glass integrated cockpit avionics.[6]

---

[4]    (...continued)
Buchanan suggests that the fact that the evidence was in the record somewhere is sufficient to create a question of fact and survive summary judgment. This is simply incorrect. Even if the evidence to which Buchanan now refers was sufficient to rebut Wyeth's evidence of inadequate warning, it was Buchanan's job to point to the evidence with specificity and particularity in the relevant brief rather than just dropping a pile of paper on the district judge's desk and expecting him to sort it out."); Tucker v. Tennessee, 539 F.3d 526, 531 (6th Cir. 2008) ("Importantly, '[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.'") (quoting Street v. J.C. Bradford & Co., 886 F.2d 1472, 479-80 (6th Cir. 1989) (citation omitted); Guarino v. Brookfield Township Trustees, 980 F.2d 399, 404 (6th Cir. 1992) ("Appellants' argument that the district court erred in not searching the record sua sponte is wholly without merit. The facts presented and designated by the moving party were the facts at hand to be dealt with by the trial court.").

[5]    The Court has rewritten certain of Defendant's material facts to enhance their clarity. Unless noted, Defendant's record citations are omitted.

[6]    A "glass cockpit" refers to a computerized environment which uses digital readouts and computer screens. Glass cockpits were designed to improve
(continued...)

2.  Defendant's trainee pilots are required to go through an intensive training program and must pass all phases to be employed as a First Officer.

3.  Defendant's training program consists of four weeks of ground school, 24 hours of simulator training sessions, simulator check rides, line oriented flight training, and operations experience ("OE").

4.  If a trainee fails to complete training, he or she may be terminated under the terms of the Flight Operations Training Manual ("FOTM").

5.  Flight training for all pilot candidates takes place in a CRJ-200 simulator and actual CRJ aircraft.

6.  Plaintiff had never flown a CRJ or flown in any glass cockpit aircraft.

7.  Plaintiff spent more time with the cockpit procedures portion of his simulator training than his classmates because he was not familiar or comfortable with the more advanced and modern glass cockpit.

8.  At the start of training, Plaintiff acknowledged to some of his instructors that "this computer scanning and those programming and analysts, I am not really sharp at it." (D.E. 21-3, Deposition of Iqbal, page 82.)

9.  Following cockpit procedures training, Plaintiff advanced to flight simulator training in a full motion flight simulator. (Id. at 98.)

10.  Plaintiff failed one simulator session because of performance problems and lack of experience in the glass cockpit. He required extra training and an additional simulator ride. (Id. at 99.)

11.  On June 1, 2008, Plaintiff's instructor noted that Plaintiff needed to work on his stall profile and his approach briefing.

12.  On June 2, 2008, the instructor noted that Plaintiff needed to continue working on stalls.

---

[6]     (...continued)
a pilot's situational awareness and focus on key aspects of flying safely while preventing task saturation. This type of cockpit assists the pilot in his flying duties and is more advanced than "stick and rudder" planes.

13. On June 3, 2008, Plaintiff needed an LOC approach, had trouble with slow flows, procedures and check V cuts.

14. On June 4, 2008, Plaintiff needed additional training on VOR, VOR/DME approach and company procedures.

15. On June 8, 2008, Plaintiff needed work on normal First Officer procedures.

16. On June 9, 2008, Mike Tygart reviewed Plaintiff's performance and noted that Plaintiff was not at required proficiency levels in most areas of aircraft operations, needed prompting on almost all tasks, needed additional training on pre-start checklist, needed more work with checklists, FMS data entry, navigation systems use and knowledge.

17. In addition, Plaintiff had trouble controlling and flying the plane, could not translate his knowledge into proper action, had trouble understanding and complying with the Air Traffic Controllers, and displayed poor cockpit setup and starting procedures.

18. June 9, 2008, is the last date that Tygart reviewed or trained Plaintiff.

19. Plaintiff did not argue with his failure in the simulator training with Tygart, agreeing that the glass cockpit "was the biggest problem." (Id. at 99-101.)

20. Plaintiff also admitted he had trouble flying according to Pinnacle's flight operations policy. (Id. at 99-100.)

21. After the unsatisfactory ride on June 8, 2008, Pinnacle gave Plaintiff an additional training session on June 16, 2008.

22. After a retaining session, instructor Cary Crouch reviewed Plaintiff's performance and noted that Plaintiff struggled controlling the aircraft and flew with excessive pitch and bank angles, struggled with reciprocals for tracking inbound radials, and struggled with recognizing abnormalities and taking corrective actions.

23. On June 19, 2008, Plaintiff underwent and passed his final simulator session and instructor J. Hart signed Plaintiff off to continue his training.

24. After Plaintiff completed his SIM training, he advanced to a proficiency check ride, a simulator-based test all trainees must pass to determine whether a pilot can satisfactorily perform certain procedures. (<u>Id.</u> at 104.)

25. Check Airman Jason Cagle administered the simulator proficiency check during Plaintiff's first check ride on June 22, 2008.

26. Plaintiff admittedly failed his first proficiency check and remarked that, again, much of his trouble was due to the unfamiliar glass cockpit. (<u>Id.</u> at 104-05.)

27. Check Airman Cagle noted that the unsatisfactory grade was due to Plaintiff's failure to maintain altitude on stall recovery, failure to set a missed approach, altitude on approach which led to level off at 900 feet, then exceeded flap limitation speed, and numerous occurrences of improper FCP/FMA usage.

28. Plaintiff received additional training on June 25, 2008. (<u>Id.</u> at 105.)

29. On June 26, 2008, Plaintiff passed his Proficiency Check Ride and was signed off to advance to the next step of training by Check Airman Mike Taylor. (<u>Id.</u> at 106.)

30. OE is a critical portion of training when the First Officer candidate flies with an experienced Captain or Check Airman to adjust to live flying. (<u>Id.</u> at 114.)

31. OE is the last portion of training before a pilot can be signed off for employment.

32. If a pilot is unable to satisfactorily pass OE then he will be dismissed from training.

33. Before being signed off, each student must fly a predetermined amount of OE (typically 25 hours) which is based on the prior flying experience of the pilot.

34. Plaintiff was initially required to fly 25 hours of OE. Plaintiff began his OE training on July 13, 2008. (<u>Id.</u> at 116.)

35. Plaintiff completed a four day trip between July 13 and July 16, 2008, with Check Airman Matt Morris.

36.   On July 14, 2008, Morris noted Plaintiff had not attained a right picture on landing and that Plaintiff needed to be smoother with the flight controls.

37.   On July 15, 2008, Morris noted that Plaintiff needed to review his flows because he did them out of order sometimes, ACARS setup is a bit slow, and he forgot to ask for APPR mode when hand flying.

38.   Plaintiff did not have any disagreement with the comments from day three. (Id. at 122.)

39.   On day four of OE, July 16, 2008, Morris noted that Plaintiff twice forgot to call for APPR mode when cleared for visual, he tended to forget to start descent once cleared, and visual approach with respect to stability needed a good deal of improvement.

40.   Plaintiff acknowledged that he was not making progress and that his daily performance was actually regressing instead of improving. (Id. at 125.)

41.   Plaintiff stated that he did not have any issues with Morris regarding his performance reviews. (Id. at 117.)

42.   Plaintiff alleged that Morris asked him about his religion during the trip. (Id. at 117.) Plaintiff went on to testify that Morris "was a very professional guy ... I mean he acted very nice. He is a very nice gentleman ... So I respect him. I liked him. He was very nice. He praised me a lot about my landings." (Id. at 117-18.)

43.   By day five of Plaintiff's OE, Plaintiff admitted that he was having trouble incorporating hand flying with the glass cockpit or setting up approach mode or setting the FCP panel. (Id. at 126.)

44.   Marco Eekhof noted an unstable approach and recommended that Plaintiff work on his flows.

45.   The training report from Eekhof stated that Plaintiff should work on transition from enroute/arrival to approach, work on data input and flow, and that Plaintiff seemed to get lost at times.

46.   On July 23 and 24, 2008, Plaintiff flew with Check Airman Don Garlock, and at that time, had completed approximately 25 hours of OE.

47.  Because Plaintiff was not ready to be signed off, he was given an additional 25 hours of OE in an attempt to help him become proficient.

48.  After the OE on July 31, 2008, Plaintiff had flown a little over 49 hours. Check Airman John Sollinger was not comfortable signing Plaintiff off based on his performance during OE.

49.  Despite disagreeing with Sollinger's teaching methods, Plaintiff acknowledged that he did actually struggle and his performance was not very good when he stated "honestly, I will never deny to you that I never struggle." (Id. at 134.)

50.  Sollinger recommended that Plaintiff be scheduled for more OE time because his performance was still not satisfactory.

51.  Plaintiff met with Fadi Hamzi, Assistant Flight Standards Manager, to discuss Plaintiff's training failures. (Id. at 141.)

52.  Hamza explained to Plaintiff that Pinnacle could not sign him off because Plaintiff's flying was not safe, his progress was poor, his radio calls were poor, and his systems knowledge was not good.(Id. at 142.)

53.  Because Plaintiff had a positive attitude and worked hard, Hamza assigned 25 additional hours of OE to give Plaintiff one last opportunity to demonstrate his proficiency.

54.  After the meeting with Hamza, Plaintiff flew with Check Airman Chuck Grewe on August 4, 5, 6, and 7, 2008.

55.  On August 5, 2008, Grewe noted incorrect settings on the taxi check, that Plaintiff was very slow on ACARS, missed 9 items on FFOD walk around, was not familiar with systems, climb flow was incorrect, Plaintiff did not have the Flight Operations Manual in his possession. Grewe advised Plaintiff not to dive for the runway and how to receive ATC clearance, and suggested that Plaintiff memorize some items and not rely on a "cheat sheet."

56.  The FAA requires that a copy of the appropriate flight operations manual for its mode be carried aboard each and every aircraft. Flying without the manual is a violation of 14 C.F.R. § 121.141.

57. On August 6, 2008, Grewe noted that Plaintiff did not know how to set up a crossing restriction with the Flight Management System ("F.M.S."), was confused about how to do a final NAV setup, set the incorrect altitude when cleared for the approach, was 40 knots below target air speed, and during the live revenue flight, Grewe had to take control and complete the landing to avoid an accident.

58. Grewe was not able to sign Plaintiff off for OE completion based on Plaintiff's unsatisfactory performance.

59. Plaintiff admits that every instructor commented on his inability to grasp the glass cockpit. (Id. at 122.)

60. Plaintiff had flown a total of 79.5 hours of OE, more than three times what was initially assigned.

61. The results of the additional flights were forwarded to Hamza to determine if any additional training was appropriate.

62. Based on Plaintiff's lack of progress, Hamza did not recommend any more OE time for Plaintiff. Under the CBA and FOTM, when additional training is granted, the Director, Line Standards or Chief Pilot outlines the training to be given.

63. Ed Foley, Pinnacle's Director of Flying, reviewed Plaintiff's training records, including the OE records and the results of the 79.5 hours given to Plaintiff, and made the decision to terminate Plaintiff.

64. On or about August 11, 2008, Pinnacle contacted Plaintiff and ALPA, the pilots' union, and requested that Plaintiff come to a meeting on August 13, 2008.

65. Plaintiff was advised he could choose to resign or that he would be terminated at the meeting.

66. Pinnacle contacted the union on Plaintiff's behalf.

67. Before the meeting began, Plaintiff talked to a union representative, who explained the process and told Plaintiff what to do. (Id. at 164, 179.)

12

68. After the discussion, Pinnacle terminated Plaintiff for his failure to complete OE and his performance failures. (<u>Id.</u> at 165.)

69. On August 7, 2008, Plaintiff talked to Scott Gorynski in Pinnacle's Human Resource ("HR") department to complain about his instructor after his final OE flight. (<u>Id.</u> at 166.)

70. The complaint occurred before Plaintiff's termination on August 13, 2008. (<u>Id.</u> at 166.)

71. Neither Ed Foley nor Fadi Hamzi had any knowledge that Plaintiff had complained to HR.

72. Plaintiff did not raise any complaint of discrimination during his termination meeting.

73. ALPA filed a grievance on Plaintiff's behalf on September 4, 2008, after Plaintiff's termination.

<u>Wrongful Termination</u>

Plaintiff alleges that he was terminated without cause. (D.E. 1 at 2-3.) The doctrine of employment at will is a long-standing rule in Tennessee, which recognizes the right of the employer or the employee to terminate the employment relationship at any time for good cause, bad cause, or no cause at all, without being guilty of a legal wrong. <u>Stein v. Davidson Hotel Co.</u>, 945 S.W.2d 714, 716 (Tenn. 1997). Certain narrow exceptions apply where the employee attempts "to exercise a statutory or constitutional right" or where the termination violates "a clear public policy which is evidenced by an unambiguous constitutional, statutory, or regulatory provision." <u>Id.</u> at 717. "[To] state a claim for relief for this very exceptional ... action, the pleader must show clear violation of some well-defined and established public policy." <u>Chism v. Mid-South Milling Co., Inc.</u>, 762 S.W.2d

13

552, 556 (Tenn. 1998). There is no such allegation here. Plaintiff must pursue his claims under the ADEA and Title VII.

Should Plaintiff contend his termination violated the terms of the Collective Bargaining Agreement ("CBA") that governed his employment with Defendant, those claims are preempted by the Railway Labor Act ("RLA"), Pub. L. No. 442, 48 Stat. 1185 (1934) (codified as amended at 45 U.S.C. §§ 151 et seq.).[7] Plaintiff was required to resolve those claims through the grievance procedure established by the CBA. Congress has delegated exclusive jurisdiction over such disputes to the system adjustment boards, Int'l Bhd. 447 F.3d at 496, and this Court lacks jurisdiction to resolve them.

The Court GRANTS Defendant's motion for summary judgment on Plaintiff's claims of wrongful termination.

Legal Standards for Claims of Discrimination and Retaliation

Under Title VII, it is "an unlawful employment practice ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973), the Supreme Court established a framework for evaluating evidence in discrimination cases where, as here, the plaintiff has

_____

[7]     Section 3 of the RLA grants adjustment boards exclusive jurisdiction to resolve disputes about the "interpretation or application of [collective bargaining] agreements" affecting the railroad and airline industries. Int'l Bhd. of Teamsters, ALF-CIO, v. United Parcel Serv., 447 F.3d 491, 494 (6th Cir. 2006).

no direct evidence of discrimination. That process has been
summarized as follows:

> First, the plaintiff has the burden of proving by the
> preponderance of the evidence a prima facie case of
> discrimination. Second, if the plaintiff succeeds in
> proving the prima facie case, the burden shifts to the
> defendant "to articulate some legitimate
> nondiscriminatory reasons for the employee's rejection."
> Third, should the defendant carry this burden, the
> plaintiff must then have an opportunity to prove by a
> preponderance of the evidence that the legitimate reasons
> offered by the defendant were not its true reasons, but
> were a pretext for discrimination.

Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 252-53

(1981) (citations omitted). This standard is used for disparate

treatment and retaliation claims under laws proscribing employment

discrimination, including Title VII and the ADEA. See, e.g.,

Spengler v. Worthington Cyclinders, 615 F.3d 481, 491-92 (6th Cir.

2010) (ADEA retaliation); Younis v. Pinnacle Airlines, Inc., 610

F.3d 359, 363 (6th Cir. 2010) (Title VII disparate treatment);

Harris v. Metropolitan Gov't of Nashville & Davidson Cnty., 594

F.3d 476, 484-85 (6th Cir. 2010) (ADEA disparate treatment); Chen

v. Dow Chem. Co., 580 F.3d 394, 402 (6th Cir. 2010) (Title VII

retaliation). "The ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the

plaintiff remains at all times with the plaintiff." Burdine, 450

U.S. at 253.

Assuming that plaintiff states a prima facie case of

discrimination, the burden shifts to defendant to articulate a

legitimate, nondiscriminatory reason for its actions. Burdine, 450

U.S. 248, 252-53. Should defendant carry that burden, plaintiff

15

must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by defendant were not its true reasons, but were a pretext for unlawful discrimination. Id. As the Sixth Circuit has explained:

> Pretext may be established "either directly by persuading the [trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." Burdine, 450 U.S. at 256, 101 S. Ct. 1089. A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action. See Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 545 (6th Cir. 2008) . . . . However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision "to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 578 (6th Cir. 2003) (en banc); see also Burdine, 450 U.S. at 259, 1010 S. Ct. 1089 ("The fact that a court may think that the employer misjudged the qualifications of applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination." (emphasis added)); Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979) ("The reasonableness of the employer's reasons may of course be probative of whether they are pretexts. The more idiosyncratic or questionable the employer's reason, the easier it will be to expose as a pretext, if indeed it is one.").

White v. Baxter Healthcare Corp., 533 F.3d 381, 392-93 (6th Cir. 2008), cert. denied, ___ U.S. ___, 129 S. Ct. 2380 (2009)(footnote omitted).

### Race or National Origin

To establish a prima facie case of race or national origin discrimination, Plaintiff must demonstrate (1) he is a

member of a protected class; (2) he suffered an adverse employment action; (3) he was qualified for the job; and (4) his employer treated similarly situated employees outside the protected class more favorably, or his position was filled with a person outside of his protected class.  Wright v. Murray Guard, 455 F.3d 702, 707 (6th Cir. 2006).

### Religion

Title VII makes it unlawful to discriminate against an employee on the basis of religion. 42 U.S.C. § 2000e-2(a). The Act broadly defines "religion" to mean "all aspects of religious observance and practice, as well as belief." 42 U.S.C. § 2000e2(j). In order to establish a prima facie case, a plaintiff must show that (1) he holds a sincere religious belief that conflicts with an employment requirement; (2) he has informed the employer about the conflicts; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement. Jiglov v. Hotel Peabody, G.P., 719 F. Supp.2d 918 (W.D. Tenn. 2010).

### Age Discrimination

The ADEA prohibits an employer from discriminating "against any individual with respect to his terms of compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To establish a prima facie case of age discrimination under the ADEA, Plaintiff must establish: (1) he was a member of the protected class, meaning he was at least 40 years old; (2) he was subjected to an adverse employment action; (3) he was qualified for the position; and (4)

17

he was replaced by a substantially younger individual. <u>Skelton v. Sara Lee Corp.</u>, 249 Fed. Appx. 450, 456 (6th Cir. 2007); <u>Hedrick v. Western Reserve Care System</u>, 355 F.3d 222, 459-60 (6th Cir. 2004); <u>Ackerman v. Diamond Shamrock Corp.</u>, 670 F.2d 66, 69 (6th Cir. 1982). Although age differences of ten years or more have generally been held to establish the "substantially younger" element of the McDonnell Douglas test, age differences of ten years or less have not. <u>Grosjean v. First Energy Corp.</u>, 349 F.3d 332, 336-69 (6th Cir. 2003). The Sixth Circuit has declined to create a bright line rule for "substantially younger," but it has held that, "in the absence of direct evidence that the employer considered age to be significant, an age difference of six years or less between an employee and a replacement is not significant." <u>Id.</u> at 340.

Analysis

Plaintiff alleges that he is Asian. (D.E. 25-1 at 21.) Plaintiff alleges that he has an accent. (D.E. 25-1 at 15.) Plaintiff alleges that he overheard an instructor say that two foreigners should not be scheduled together in one cockpit and that the instructor mimicked a foreign accent. (Deposition of Iqbal, D.E. 21-3 at 15.) Plaintiff alleges that he was asked if he is Muslim. (<u>Id.</u> at 117.) Plaintiff, however, fails to allege what sincere religious beliefs he may hold. (D.E. 25-1 at 17.) Plaintiff has also failed to allege that his religious beliefs conflicted with an employment requirement or that he informed Defendant about the conflict. Plaintiff alleges that he is an "adult." (D.E. 25-1.) Plaintiff contends that he was asked if Plaintiff's former employer

18

had any age restrictions in hiring. (D.E. 1 at 3, Deposition of Iqbal, D.E. 21-3 at 131.) Plaintiff's documents do not reveal Plaintiff's age and fail to establish his age when he was terminated.

During Plaintiff's deposition, he acknowledged that he had no prior experience with the glass cockpit, struggled with the glass cockpit, and that he received extra training because of his inexperience with the glass cockpit. (Deposition of Iqbal, D.E. 21-3 at 99-101.) Plaintiff testified that he did not have any issues with the performance reviews by the instructor who asked about his religious beliefs because the instructor was a very professional man who praised Plaintiff's landings. (Deposition of Iqbal, D.E. 21-3 at 117, 122.) Plaintiff acknowledged that he was not making progress at that stage of his training. (Id. at 125.) Plaintiff was evaluated by two other instructors who also determined Plaintiff's performance was deficient and was provided with additional OE training after those reviews. Plaintiff acknowledged that he "struggled" and got "dogged down" during his training session with the pilot who asked about age restrictions. (Id. at 134.) After that OE review, Plaintiff was allowed to complete twenty-five (25) additional hours of OE, a last opportunity to demonstrate proficiency, because of his positive attitude. (D.E. 21-5 at 1-2.) The final instructor was not able to sign Plaintiff off for OE completion based on Plaintiff's unsatisfactory performance.

Every SIM and OE instructor commented on Plaintiff's inability to grasp the glass cockpit. (D.E. 21-3 at 122.) The record reveals

that, when Plaintiff failed to pass a stage of required training, each instructor recommended more training for Plaintiff. Plaintiff fails to rebut the affidavit of Fadi Hamza, Assistant Flight Standards Manager, that Hamza made all decisions to allow Plaintiff additional training rather than the individual instructors. Plaintiff has not produced any affidavit or verified document which establishes that Hamza was aware of any discriminatory comments or behavior by any instructor or that Hamza's final decision on additional training was influenced by any discriminatory motive. Likewise, Plaintiff fails to rebut the affidavit of Edward Foley, Director of Flying, that the decision to terminate Plaintiff was based solely on his review of Plaintiff's training records, including the OE records.

It is undisputed that Plaintiff was terminated. However, Defendant disputes that Plaintiff was qualified for his position because he could not satisfactorily complete his training. Even after additional training, Plaintiff was not performing "at a level which met [Defendant's] legitimate expectations." McDonald v. Union Camp Corp. 898 F.2d 1155, 1160 (6th Cir. 1990). Plaintiff's lack of proficiency with the glass cockpit resulted in his failure to pass OE evaluation. Under the terms of the FOTM, failure to complete training is a basis for termination. Director Foley's decision to terminate Plaintiff was an informed, professional judgment made upon review of Plaintiff's evaluations after Plaintiff had been provided with numerous additional training opportunities and failed to show improvement. Adebisi v. University of Tennessee, 341 Fed.

20

App'x 111, 112 (6th Cir. 2009). Defendant's explanation for Plaintiff's termination is "facially legitimate and non-discriminatory." White v. Baxter Healthcare Corp., 533 F.3d at 392.

Plaintiff has not provided exhibits or affidavits establishing that Defendant considered national origin, race, accent, age, or religion to be significant in its decision to terminate his employment. Plaintiff has also failed to present any authenticated exhibit or affidavit that rebuts Defendant's determination that Plaintiff's failed to demonstrate proficiency with the glass cockpit, a legitimate, non-discriminatory reason for termination. There are no genuine issues of material fact as to Plaintiff's claims of race, national origin, accent, religious, and age discrimination, and Defendant is entitled to judgment as a matter of law.

<u>Retaliation</u>

Under 42 U.S.C. § 2000e-3(a), "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." The elements of a Title VII retaliation claim are as follows:

> (1) [the plaintiff] engaged in activity protected by Title VII; (2) the defendant knew of [his] exercise of [his] protected rights; (3) the defendant subsequently took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive

retaliatory harassment; and (4) there was a causal connection between the plaintiff's protected activity and the adverse employment action.

Barrett v. Whirlpool Corp., 556 F.3d 502, 516 (6th Cir. 2009). In this case, the first element is satisfied by Plaintiff's complaint to Human Resources on August 7, 2009. Plaintiff told someone in Human Resources that "this comment is just getting on me, you know, the final stage." (D.E. 21-3 at 166.) Plaintiff describe what he meant by "this comment" during the deposition. The third element has been satisfied.

Defendant contends that Plaintiff cannot satisfy the second and fourth elements of a prima facie case. (D.E. 21-1 at 16.) In this case, Plaintiff, who has the burden of proof at trial, has come forward with no admissible evidence that the relevant decisionmakers knew of his prior protected activity. Defendant has submitted affidavits from Foley and Hamza, and each affidavit states that they had no knowledge that Plaintiff had complained of discrimination or engaged in any type of protected activity and, also, that no one from Human Resources had contacted them to discuss any complaints by Plaintiff. (D.E. 21-4, Foley Aff., ¶ 19; D.E. 21-5, Hamza Aff., ¶ 7.) The Court will, therefore, consider the decisionmakers' lack of knowledge to be undisputed for purposes of this motion. Fed. R. Civ. P. 56(c)(2); see also Hunter v. Secretary of U.S. Army, 565 F.3d 986, 996 (6th Cir. 2009)(affirming summary judgment on retaliation claim because, inter alia, "the record fails to indicate that Pitts, Adlam, or Cherukuri even knew

22

that Hunter had contacted an EEO counselor or had filed a formal EEO complaint").

Even if the decisionmakers had known of Plaintiff's prior protected activity, Defendant argues that Plaintiff has not established a causal link between his protected activity and the subsequent failure to hire him. (D.E. 21-1 at 16-17.)

"Causation is found where the plaintiff 'proffer[s] evidence sufficient to raise the inference that [the] protected activity was the likely reason for the adverse action.'" Lindsay v. Yates, 578 F.3d 407, 418 (6th Cir. 2009) (quoting Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 596 (6th Cir. 2007)) (alterations in original); see also Upshaw v. Ford Motor Co., 576 F.3d 576, 588 (6th Cir. 2009) (same). "The burden of proof at the prima facie stage is 'minimal'; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action." Upshaw, 576 F.3d at 588. The mere fact that an employer took an adverse action against an employee after he engaged in protected activity is insufficient to justify an inference that there was a causal connection between the two events. Thornton v. Federal Express Corp., 530 F.3d 451, 455 (6th Cir. 2008). On the other hand, "a reasonable juror may infer a plaintiff's undertaking of a protected activity was the likely reason for the defendant's adverse action when the temporal proximity is 'very close' in retaliation cases." Lindsay, 578 F.3d at 596; see also Upshaw, 576 F.3d at 588 ("We have held that the

combination of close temporal proximity between an employer's heightened scrutiny and that plaintiff's filing of an EEOC charge is sufficient 'to establish the causal nexus needed to establish a prima facie case' of retaliation.")(quoting <u>Hamilton v. General Elec.</u>, 556 F.3d 428, 436 (6th Cir. 2009)).

In this case, the decision was made to terminate Plaintiff four days after his complaint to Human Resources. Plaintiff testified at his deposition that he was told "give me your name, number ... And that's the extent of it." (D.E. 21-3 at 166.) Plaintiff has no affidavit or verified documents which establishes that his complaint was being actively investigated before, or at the time of, his termination. Plaintiff has no affidavit establishing the either Hamza or Foley were aware of his complaint. However, the record before the Court established that Plaintiff's performance was under constant review by Hamza as early as June 2008, before Plaintiff's complaint to Human Resources in August. (D.E. 21-5, Hamza Aff. at 1-2.) The record establishes that Plaintiff was consistently failing his evaluations and requiring additional training before being signed off to the next level. He was unable to satisfactorily pass OE and was dismissed. Plaintiff has not established that this reason has no basis in fact, was not the real reason, or was insufficient to explain his termination. Therefore, Plaintiff has not come forward with sufficient evidence to raise a triable issue as to pretext. As set forth above, Plaintiff cannot show that Defendant's reason his termination was pretextual.

The Court GRANTS Defendant's motion for summary judgment on Plaintiff's claim of retaliation. Judgment shall be entered for Defendant.

The Court must also consider whether Plaintiff should be allowed to appeal this decision in forma pauperis, should he seek to do so. Twenty-eight U.S.C. § 1915(a)(3) provides that "[a]n appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith."

Pursuant to the Federal Rules of Appellate Procedure, a non-prisoner desiring to proceed on appeal in forma pauperis must obtain pauper status under Fed. R. App. P. 24(a). See Callihan v. Schneider, 178 F.3d 800, 803-04 (6th Cir. 1999). Rule 24(a)(3) provides that if a party was permitted to proceed in forma pauperis in the district court, he may also proceed on appeal in forma pauperis without further authorization unless the district court "certifies that the appeal is not taken in good faith or finds that the party is not otherwise entitled to proceed in forma pauperis." If the district court denies pauper status, the party may file a motion to proceed in forma pauperis in the Court of Appeals. Fed. R. App. P. 24(a)(4)-(5).

The good faith standard is an objective one. Coppedge v. United States, 369 U.S. 438, 445 (1962). The test under 28 U.S.C. § 1915(a) for whether an appeal is taken in good faith is whether the litigant seeks appellate review of any issue that is not frivolous. Id. The same considerations that lead the Court to grant Defendant's motion for summary judgment also compel the conclusion

25

that an appeal would not be taken in good faith. It is therefore CERTIFIED, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal in this matter by Plaintiff would not be taken in good faith and Plaintiff may not proceed on appeal in forma pauperis. Leave to proceed on appeal in forma pauperis is, therefore, DENIED. If Plaintiff files a notice of appeal, he must also pay the full $455 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the United States Court of Appeals for the Sixth Circuit within thirty (30) days.

IT IS SO ORDERED this 14th day of July, 2011.

**s/ S. Thomas Anderson**

S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE